Good morning. Good morning, Your Honors, and may it please the court. My name is Matthew Hanks, and I represent the appellants, Epona, LLC, and Michael Fowler. Your Honors, the district court committed what I see as at least four fundamental errors of law when it denied or dismissed my client's unbridled discretion and RLUIPA claims and refused to entertain their motion for preliminary injunction, actually denied the motion as being moved. Why don't we deal with RLUIPA first? You're not a religious organization. How do you have any standing to bring a RLUIPA claim? So RLUIPA, and that was essentially, that was the trial court's ruling. It was right, wasn't it? No, I don't believe it was right, because Congress, I think, was explicit in terms of standing in the RLUIPA context, and that is under 42 U.S.C. 2000 C.C. dash two subdivision A. And what it says is that standing under RLUIPA extends to the full extent of Article Three. It doesn't say that only religious organizations have standing. It doesn't say that only religious assemblies have standing. It doesn't limit it to any group whatsoever. What it does say is that standing is conferred to the full extent of Article Three. Wait a minute. I'm looking here at a title, Centro Familiar Cristiano Buenos Nuevos versus City of Yuma, one of our cases that quotes RLUIPA, and it says that in order to establish this claim, there must be an imposition or implementation of a land use regulation, two, by a government, three, on a religious assembly or institution. Now, are you a religious assembly or your client a religious assembly or institution? No, but we do believe that there has been a... That our claim does check all these boxes, though. Well, whatever you wanna call it, do you do a survey, for example, of the people who are getting married to ask whether they're religious, or whether they profess any particular creed, or whether they're religious? Well, I don't think any of that is done. I don't believe that that's in the record. So basically, you are, what are you, an LLP? An LLC... And an individual, Mr. Bishop's father. Okay, so you're an individual and an LLC, and do you profess to be a religious... Are you a 501 C3 organization? No, Your Honor. Okay, do you profess any religious affiliation at all, for purposes of this litigation? Not for this claim, but what we do argue, and what we believe, is that religious... That weddings, and this is what this case is about, weddings are inherently religious assemblies. Since when? Since forever, because the... You don't know your history, my friend. I'm sorry? Marriages were about money. Always were about money, and always have been. The religious component came much later, and today, one could make a pretty good argument that it's almost irrelevant. In many situations. Are you asking us to believe that because marriage sometimes involves a religious ceremony, that that gives you standing as a religious institution? We believe that marriages and weddings are inherently... Marriage ceremonies, wedding ceremonies, are inherently religious. They... All wedding ceremonies are inherently religious? Not all wedding ceremonies, but I would say that the concept of marriage, and I think the concept... And wedding ceremonies do spring from religion, do spring from religious ethics, religious morals. So you wouldn't marry an atheist? Well... That would be terrible, wouldn't it? No, but look, the argument that we are presenting is that we believe that weddings themselves are dressed in religious symbolism, dressed in religious traditions. There are pictures in the record of weddings that have taken place, and there are descriptions of weddings that have taken place at Epona Estate, which do include religious... There's no question that some ceremonies are indeed religious. No question about that, but the question here is, does Epona and your client have standing under a federal law designed to protect religious institutions from discrimination and land use? Religious institutions and religious assemblies, correct. And my argument is that standing under RLUIPA is guided by Article 3, to the full extent of Article 3. Okay, let's say that's true, but you still have to meet the qualification that you're a religious institution or a religious assembly. And I'm saying, I don't see it. How does your LLC and your client become a religious institution or a religious assembly? We believe that the wedding ceremonies that we seek to hold on the property, that we have held on the property... So you admit that your client and the LLC is not a religious institution or assembly, but what you do is related to religious ceremonies. Well, essentially, yes. Let's be clear, my client certainly holds religious beliefs. Yeah, I don't care about that. I'm just talking about this statute. Again, yeah, I think I would agree with that. How can an LLC hold religious beliefs? I'm referring to Mr. Fowler. Mr. Fowler, who I understand is actually... There's employees of Epona who are ordained ministers who would... Corporations have some rights according to the Supreme Court, maybe the LLC doesn't. Well, maybe I can... Taxpayers are people... Corporations are people. Indeed. And maybe my time's better spent discussing... Okay, sure, go ahead. So basically, on your relief argument, you admit that's not your strongest suit, right? My strongest argument has always been the unbridled discretion that's really my focus on this case, ever since it was filed and ever since my client came to me and having been denied and refused a CUP to hold wedding ceremonies on his property. So on unbridled discretion, there are... I think your best argument stems from certain words that really aren't defined, such as obnoxious and harmful and impairing the utility of the neighborhood and all that. And so read in isolation, I think that's potentially problematic. But my question to you is, as the district court pointed out, the discretion in this case is really guided by some fairly specific standards. There are 28 or so factors that permitting officials must consider. There are seven standards that they have to meet. If it's denied, they have to make specific factual findings. So what additional guidance do the permitting officials really need in this case? So let me go right at the... What you had indicated in terms of the district court judge's ruling and applicability of these factors, sections 8109-0.1 and 8109-0.4, which your honor just indicated, requires the county to take into account these factors. That's not true. That's simply not accurate. As a matter of fact, these sections have nothing whatsoever to do with the denial or the grant of a CUP. The grant or the denial of a CUP is governed by 811.1.2.1.1, which your honor alluded to, discusses whether or not the use is obnoxious or whether or not the use is harmful or against the public interest. By contrast, 8109-0.1 and the other provision that was cited by the district court deals with factors that may be considered when imposing conditions, but it doesn't say, doesn't speak to whether or not the CUP should be issued in the first place. It deals with conditions, and of course it uses the word may. It doesn't use the word must. It doesn't use the word shall. There's no mandate there. There's no requirement that it be followed. What's followed is 811.1.2.1.1, which as your honor points out, requires findings as to whether or not the proposed use is obnoxious, etc. I would also point out that those factors that you've described in 8109 themselves are not concrete. They're not objective. They're categories. Noise, land, air resources. There's no guidance that's being provided by those factors, even if that's what was governing the standard for approval or disapproval, which they're not. So let me turn then to your honor's point about the findings. That's not... So you're the way... Let me make sure I understand your argument. You're saying that 8111-1.2.1.1, the permitting approval standards, that's a self contained provision. There's no reference to other guidance or standards. Is that how you're reading it? Absolutely. And that's what the NCCO provides. And I think if you look at how the county viewed the application of my client, they never once mentioned 8109-0.1, or that there were some other factors that we're looking at, or there's some guidance that we're looking at in terms of approval or disapproval. That deals with types of conditions that may be imposed. That's a very different provision. That doesn't purport to restrict the discretion that's being exercised under the standards of approval, 811, 8111, etc. Well, didn't the planning commission refer to 8... So many numbers, 111-121D in making its findings? Well, right. So there are several standards of 811.1.2... Yeah, right. .1.1, and those are whether or not the use is harmful, whether or not the use is obnoxious, whether or not it's detrimental to the public interest. And these are the same CUP standards that the courts have addressed and struck down over and over and over again, most recently in the Royale opinion, which was issued by this court not too long ago. I'm familiar with that one. I know you were familiar with it. You were the author of that opinion, Your Honor. And these are the exact same standards. And as a matter of fact, these standards are even broader than what was at issue in Royale, even broader than what was at issue in Dease and in 3570 and in Desert Outdoor and all the other CUP cases where the courts have looked at these standards and said, you know, they're just too broad, they're untethered. There's no objective criteria that's governing these standards. Isn't one of your best arguments there's really no time limit on when a decision has to be made? I think that that is also a very important argument. And I think that's also where the district court got it wrong. And again, that was one of the bases for the Royale decision and other decisions dealing with CUPs. What the court said, what the trial court said is that, well, this permitting scheme is content neutral. And therefore, you don't even have to look at whether or not that there are reasonable deadlines. That's not true. Because in the Ninth Circuit, what the court has said in Kawamanu is that one of the elements of content neutrality is that you don't have this unbridled discretionary scheme. So yes, when you have a CUP requirement that is governing expressive conduct, such as weddings, and Kawamanu found that weddings are expressive conduct, there has to be reasonable time limits imposed or else the length of time is effectively the denial of speech. And in this case, it's almost exactly the same situation as in Royale. Is your argument based in a First Amendment claim? I don't remember that. Did you did you assert a First Amendment claim? That is the basis of our claim. First Amendment in a religious context, but I'm talking about speech. No, no. The thrust of my argument has always been free speech. We've pleaded since the beginning of this case. We briefed it extensively in the trial court. I only have a minute 44. Okay, you want to save that? Yes. Great. Here from the county. Good morning, Your Honors. My name is Rhonda McCaig, Assistant County Counsel for the County of Ventura. So you're probably very familiar with Ninth Circuit precedent about these kinds of CUP things. And so how would you line it up with precedent? Well, in my brief, I take the position that we don't even get to an end. Because this is not a case, even though it's styled as a First Amendment case and a facial challenge based on unbridled discretion, you don't see the same traditional concerns that underline most of our First Amendment jurisprudence in the Ninth Circuit. There's no chilling effect here, Your Honor. We have here a private, a purely private forum, okay? This is not something that's open to the public and anybody can walk on or off. This is an estate with a gate that rents itself out for outdoor commercial events venues. This is a land use regulation that regulates the use of that private property. The people seeking to engage in the expression probably don't even know the zoning ordinance exists. So we don't have... Counsel, with respect, our Kahumanu case takes care of your argument, does it not? I mean, there's clearly standing the fact that it's a private property, does not change the fact that you can challenge a facial, an ordinance on a facial basis, right? Well, I think there's a couple of distinctions that are important here, Your Honor. The first one is, Kahumanu, while it was deemed to be a non-public forum for purposes of the analysis, a non-public forum under federal jurisprudence is not necessarily the same thing as a purely private forum. And I know Judge Motz has addressed this issue in her child evangelism fellowship case. And you've talked about the lesser degrees of scrutiny that apply, the less forum the public is. Here, we have a non-public forum in the Kahumanu case, here we have a purely private forum. So the risk of censorship is even further reduced. And I think that's important when you consider whether or not you're gonna apply this very rigorous unbridled discretion analysis. And the other distinction of Kahumanu is the unbridled discretion that was at issue there. Number one, it was a permitting scheme that applied to the speakers themselves. It didn't apply to the vendors, it applied to the people who wanted to engage in the speech. And so there was a real risk of censorship and a chilling effect, because those people could have a legitimate fear that they're not gonna even apply because they don't wanna fear having their license denied. But the discretion that was at issue... So the licensing of marriages, even though they're doing it personally, doesn't count because they're not like in Real, the tattoo artist. Is that right? I'm not sure I follow your question. Okay. If I understood you correctly, you just said that because most of our case law, by your reckoning, deals with the First Amendment rights of an individual, you're saying that in this case, because we have an individual here too, who's authorizing a marriage, that that's different, it's not like a tattoo. Is that your argument? Right. I'm saying in the tattoo line of cases and in the Real case, we talked about the business of tattooing being the expressive activity. Since when has this circuit ever held that the business of running a commercial events venue that might hold weddings, which might include the actual marriage ceremony, or who knows, that could be off site? You never know what could happen. When have we held that that is protected under the First Amendment? We haven't. And so there's a really big distinction between this case and Kahumanu. I love Kahumanu because it's so different on the facts in our case that I think it is. The issue on Kahumanu was a single decision maker who could, after reading the names on the permit, decide, I revoke this permit. I don't have to tell you why. You have no ability to appeal. Well, but you're sort of... Maybe you're entitled to do this, but you're switching grounds on us. I thought what you were talking there was, we were talking about the forum, not the discretion or not of the decision maker. Your Honor, I have. I mean, so which is important to you? They're both important. Let me tell you why. So if you have... We said this forum was protected. Yes. Is that the end of your case? It's not. To me, the bigger point I was trying to make, and I apologize for losing everyone here. The bigger point I'm trying to make is that the unbridled discretion analysis should not apply. That is an analysis that applies under the City of Lakewood case. It talks about the factors that plaintiffs have to meet to make that challenge. And they have to make this threshold showing that there is a risk of a chilling effect, that there is really a threat to free speech. And because of the forum, and because of the discretion that's involved here, because of those things, we don't have that same chilling effect. That's my point. When you look at all those factors together, combined with the fact that, by the way, we're talking about marriage ceremonies. No one's not getting married in the County of Ventura, let me tell you that. There are thousands of places to get married. Anyone can get married at their home, in their church, as an accessory use. There are public parks, beaches... But Councilor, isn't that a red herring? In the Real case, there are a lot of tattoo parlors in the City of Long Beach, and the county barred them from certain areas because they said it was not in accordance with public morals, and people didn't like it, and there was competition from other people, and they had an indefinite time to expand things. This guy wasn't the only tattoo artist in his place. You didn't know whether he was gonna have business or not gonna have business. You've been looking at it for a long time. I'm not sure I buy the argument that just because you can do it somewhere else, that this plaintiff is not entitled to exercise his First Amendment rights to conduct marriages. I agree with that, Your Honor. My point is really, when you look at the totality of the effect, do we have the same type of built in animus towards marriage ceremonies that we do toward tattoo parlors, and the secondary effects that might have on them? What we've got here, like with most zoning things, we've got a NIMBY problem. We do. And we have a NIMBY problem that crashes into constitutional issues, and the question is, how do you balance it? So, here we have a situation, not unlike Kahuna, certainly in terms of standing, we've got an ordinance that, at least in terms of the CUP, is quite indefinite. I admit there are other parts of the code that can be consulted, but the reality is, these are pretty vague terms, and there's no time limit on it. I'm troubled by that. I really am. I understand I did a lot of zoning work in my practice days. I understand the need for the county to have flexibility. I understand you gotta comply with environmental laws, et cetera, et cetera. You load up all kinds of things on the CUP. But in effect, you've let the NIMBY problem completely overwhelm any constitutional rights that this plaintiff had. I'm troubled by that. So let me answer that, Your Honor. Okay. So, a couple of things. First of all, when we analyze an ordinance that's challenged under the unbridled discretion doctrine, we look at three factors. That's the Seattle affiliates test from this circuit. We don't just look at the standards and see if they're right. We look at three things, three factors. One, are there objective criteria? Two, are findings required for denial? And three, is there an adequate mechanism for judicial review? Those are the three factors under this Ninth Circuit's test. No one factor is determinative under that test. Now, I will tell you, I agree. With respect to the standards, they are discretionary. There are factors... Well, it's not a problem to be discretionary. The problem is whether there's sufficient guidance there that would prevent the permitting officials from having unbridled discretion. Now, I asked counsel this question. Now, I'll give you a chance to respond to it as well. The district court's analysis really relied heavily on the fact that there are factors and standards that basically guide the permitting officials' decisions. And counsel said that those standards really don't apply because you're dash, you know the rest, right? Right. And so if you focus only on the four corners of that particular ordinance, there are words such as obnoxious, harmful, detrimental public interest or welfare, the type of language that in some cases we've expressed great concerns leading to unbridled discretion. So how do you respond to that? How do we know that you can then cross reference these standards and guidelines and that permitting officials do so in every case when they deny a permit? Okay. So there is some case law, and I didn't know this was an issue, but I will see if I can recall what it was, that says when you are challenged a zoning ordinance, you read the whole thing in context. You can't nitpick one piece of a zoning ordinance and say, well, we can only look at these four corners of this provision. So I think the whole zoning ordinance is fair game, and I disagree with Mr. Hinks' argument on that front. I agree with how he... So, wait a minute. You're saying that our case law says you gotta look at the whole ordinance to determine whether something's unbridled? It's not in the unbridled discretion context, it's more of just a general statement of law that... Okay, but we're talking about unbridled discretion here. Are you saying that there is a case or cases that says we have to look at the totality of the ordinance to determine whether there's unbridled discretion? If there is, what's that case? No, I don't have that case, Your Honor. My point is... There isn't one, is there? I don't believe that there is. Okay. But my point... Is there a cross reference within the regulation? No, Your Honor, there's not. But you have an entire ordinance and that is the scheme that the county follows. These planning commissioners who make this decision and the Board of Supervisors are familiar with the entire ordinance. And here's what I would say about Mr. Hinks' point. Yes, these factors that were identified by the district court judge are not required to be followed. They are guidance for the people making the decisions, making the land use decisions. Sure, but we've got to know that they utilize the guidance and that's really my question. There are factors. Here it says the provision that the district court cited is Article 9, Section 8109-.1. Factors such as the following may be considered in establishing permit conditions. It doesn't talk about denial of permits. You're right. It does not, Your Honor. So, two things. This is comparable to the G.K. Limited case, this Ninth Circuit case where we had a similar discretionary standard, which was, I believe, to approve posting of a sign, an official would review the sign, talk about opportunity for censorship, would review the content of the sign and then decide if it could be posted based on whether it was compatible with the surrounding area. But since that case, though, the Supreme Court has found that a sign in, I think, Mesa or Gilbert, Arizona, didn't meet the standard because, despite what you're talking about, the Constitution was forgotten, if you will, and they overruled it. Isn't that an overlay on what we're talking about here? Well, it is, Your Honor, but I think there's another component to this that we're missing and that is the county's historical practice in applying the ordinance, which Supreme Court authority, and that's outlined on page 31 of my brief, says we should consider in doing this. And here, we don't even have to have any extra evidence in the record because plaintiffs pled that information. They told us two things. Number one, they told us, of all the people to apply for a permit to hold wedding events, they're the only ones who have ever been denied. And we know from the record that of all the people who... Sorry, not of all the people, but we know from the record that their neighbors, in fact, and their entire homeowners association, came out and protested and opposed this particular use. And the reasons they cited were the reasons identified by Judge Gee in her order, which was concerns about traffic, safety, risk of vandalism, risk of trespassing. So we know how the county applies this ordinance. In the history of mankind, according to plaintiffs, it's never denied one of these except for plaintiffs. And when you look at why, the reasons make sense and they're perfectly consistent with those factors identified by Judge Gee. And that can't be overlooked. It is important under Supreme Court jurisprudence to look at the county's historical practice in applying this. Why? Because it tells you how they interpret the standards. And no standards are gonna be perfectly defined unless they are... But they're gonna be on a case by case basis, are they not? It's true, yes. So are you telling that when this permit was denied, that the Planning Commission, and I guess later, of course the county supervisors is it? I'm not sure exactly, but whatever it was, that they went through and took each one of these criteria and analyzed it and made a finding? No, Your Honor, because we're not dealing with an as applied challenge here. We're dealing with a facial plan. No, I get that. I just... And the ordinance was amended after we decided there. My only point was that you were talking about, they said they were the only ones. I'm just saying that for purposes of an ad, a facial challenge, which is what we're talking about here. Yes, Your Honor. It's kind of irrelevant, that particular point. What we're really talking about is you look at the face of this document and you see whether it meets the Supreme Court's and our standards about whether the discretion is unlimited and the timing is unlimited. That's what we're really talking about and how that conflicts, if at all, with the constitutional restrictions on First Amendment issues. Well, Your Honor, I have one minute left, so I don't think I'm gonna move you any further on the discretionary standards, but let me talk about the two other criteria, because there are three, and again, not one is determinative. The second one is we have to have factual findings for review. We have those. We get to check that box and the county gets full credit. I know plaintiff wants to say, well, the findings are meaningless and it's really easy to make findings in California, but that's not what Ninth Circuit authority says. Ninth Circuit authority says, if you have findings, specific factual findings for denial, you get to check the box and you get full credit. So I ask that you give the county full credit for amending its ordinance. The third factor is whether or not there are appropriate mechanisms for judicial review. Here, I think we have that in spades and I can address your timing argument. We have decision by a planning director with review to a five person planning commission with a de novo review to a five person board of supervisors. These are public hearings with notice and opportunity to participate. If you don't like the board of supervisors decision, you have appellate review to the superior court. So we've got that nailed down. The issue about timing... Well, the question I have is this, counsel, and with respect, it seems to me you're jumping between as applied and a facial challenge. You're talking about the way this was applied, we did this. I'm saying if you look at the ordinance on its face and you consider what's there, that's the facial challenge. That's what we're dealing with here. We're not talking about really what actually happened in this case. We're really talking about the ordinance. I understand that. No, I'm talking about... We're talking about the same thing, Your Honor, and under Seattle affiliates, this is what we look at. We look at our ordinance, which allows for all of these levels of review. I'm not saying that's what happened here, although it is. I thought you said that in this case, they made factual findings and so on, all of which is wonderful, but I don't think it has anything to do with our facial... And I'm not saying that. We didn't make the factual findings that are now required in this case. We didn't do it the same way. We made them orally on the record. Now we do it differently because we've amended our ordinance. But the facial ordinance itself, we have these standards that someone could argue give too much discretion or they don't. We have the requirement of factual findings that's on the face of the ordinance itself. And then we have this third thing, which is a mechanism for judicial review. That's all facial. And under Seattle affiliates, we consider each three of those factors. And we can consider timing, although under Southern Oregon Barter Fair, if the regulation is viewpoint neutral, we don't have a timing issue under Ninth Circuit authority. And even if you don't believe me on that, Judge Breyer wrote a great opinion, Citizens Free Speech versus County of Alameda. And he says, we cannot basically circumvent the legislature who puts down in the laws, the statutes, the requirements for when permits are going to be granted. You're talking about District Judge Chuck Breyer, right? Yes, sir. And Judge Breyer said that... Wonderful man. Yes. I had a big trial in front of him many years ago. Judge Breyer explains that if the California Permit Streamlining Act applies to your project, that's all we need to say on the issue of timing because that's legislated. And the legislature has said, this is the timing that we're going to apply to this permit. You can see why a permit in this case, which has to satisfy California Environmental Quality Act, is gonna take more time than some other kind of ministerial permit. This was a big deal. We appreciate your argument. You're a very enthusiastic and talented lawyer, and we appreciate it, but we're over time. Thank you, Your Honor. So let's hear from your opponent here. Thank you, Your Honor. Just to respond in the brief time that I have left. First off, Council had suggested that the First Amendment isn't even implicated here because what we're talking about is a commercial event facility that may happen to include weddings. That's not true. CUP ordinance here specifically calls out weddings as one type of use that requires a CUP. My clients applied for a wedding permit that was their intention the whole time to obtain approval to hold and host the weddings on their property. Would they have needed a permit if they hadn't performed weddings? I'm sorry? Would they need a permit if they hadn't performed weddings? Yes, according to the county. You need a CUP. The other two requirements that Council has said, well, conceded essentially on the discretion point. There's too much discretion. There's no guidance. I think that that's probably enough to require a reversal here. But even when we look at the other requirements, let's look at the timing. There is no requirement to hold... One of the requirements is that they have to hold a public hearing. There's no deadline in this ordinance by which that public hearing needs to happen. So it is limitless in what this case shows. Fifteen months, I think, from application until final decision. I don't think that that's constitutionally tolerable. In terms of the findings, you know, Council says, well, we've amended our ordinance now. We've changed the way we do business. Except that that's not true. Because what the county said and what County Council said and told the Board of Supervisors when they were approaching that amendment, they said, this doesn't change anything. This is the way that we've done it always. We've always included some findings. And there were, in fact, certain written findings that set forth no basis. They talk... They say nothing about these noise and traffic concerns that supposedly animate this, the decision to deny the CUP. So what the county has said is that they're not changing their practice. They amended it to require findings explicitly, but they're not changing their practice. Your time is up. We appreciate your argument, both of you. And we will rule on the case as soon as we can. The case just argued is submitted.
judges: Motz, M. Smith, Nguyen